United States District Court
District of Connecticut
FILED AT NEW HAVEN

4/8 _____ ,20_24

By___ N. Langello _____
Deputy Clerk

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH CELLULAR DEVICE ASSIGNED PHONE NUMBER (678) 306-9517 AND IMSI NUMBER 311480790102424 AT A PREMISES CONTROLLED BY VERIZON WIRELESS | Case No. 3:24MJ __335__ (MEG)<br><br>**Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Alex MacNamara, being duly sworn, depose and state that:

### Introduction and Agent Background

1.     I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2.     I am a Special Agent with the Drug Enforcement Administration ("DEA"), United States Department of Justice.  I am currently assigned to the New Haven District Office ("NHDO") and have been since August 7, 2022.  In my capacity as a Special Agent with the DEA, I am a participating member of the Organized Crime Drug Enforcement Task Force ("Task Force"), which is comprised of personnel from federal, state, and local law enforcement agencies.

3.     Prior to my assignment to the NHDO, I successfully completed a 17-week DEA training academy in Quantico, VA.  Over the course of the academy, I was trained in the use/management of confidential sources, surveillance, undercover operations, tactical operations, drug identification, federal criminal law, and a variety of specific topics related to drug trafficking.

1

4.      I was previously a sworn member of the Fairfield Police Department from December 27, 2018, thru March 27, 2022.  I have participated in numerous criminal investigations involving violations of local criminal law.  Pursuant to my participation in those investigations, I have performed various tasks which include, but are not limited to: (a) conducting traffic stops of individuals in possession of narcotics (b) interviewing witnesses, victims, and suspects during the course of calls for service (c) assisting in the execution of and application for search and arrest warrants (d) conducting surveillance in relation to criminal complaints and problem areas in a local law enforcement capacity.

### Purpose of the Affidavit

5.      As part of my duties, I am currently participating in an investigation into the suspected criminal activity of Donald OGMAN, also known as "MaineyO."

6.      I submit this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A) authorizing the collection of both historical and prospective location information regarding cellular telephone assigned phone number (678) 306-9517, accessed through International Mobile Subscriber Identity ("IMSI") 311480790102424 ("**Target Telephone 1**") and used by OGMAN. **Target Telephone 1** is further described in Attachment A.  **Target Telephone 1** is currently in the custody or control of Verizon Wireless ("Verizon"), a wireless communications service provider that is headquartered in Bedminster, New Jersey. As a provider of wireless communications service, Verizon is a provider of an electronic communications service, as defined in 18 U.S.C. § 2510(15).

7.      The requested historical cell site data is described in further detail below and in Attachment B hereto.

8.      The requested precise location information (including E-911 Phase II data, prospective cell site data, and communication detail records) is described in further detail below and in Attachment C hereto.

9.      Based on the facts contained in this Affidavit, I submit that there is probable cause to believe and I do believe that the search warrant will reveal evidence, instrumentalities, contraband, or fruits of violations of federal law by the holder of **Target Telephone 1** and others, specifically, violations of 21 U.S.C. §§ 841(a)(1) (Distribution of Narcotics, Possession with Intent to Distribute Narcotics); 846 (Conspiracy to Distribute and Possess with Intent to Distribute Narcotics); and 843(b) (Use of a Communication Facility to Facilitate a Narcotics Trafficking Felony) (hereafter referred to as the "Target Offenses").

10.     Based on my training and experience, and for all the reasons set forth herein, I submit that probable cause exists to believe that the requested historical cell site and precise location information described in Attachments B and C will constitute or lead to evidence of offenses involving the Target Offenses, as well as the identification of individuals who are engaged in the commission of the Target Offenses.

11.     Since this Affidavit is being submitted for the limited purpose of authorizing the government to obtain (a) historical and prospective location information described in Attachments B and C, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish the foundation for the proposed warrants.

12.     The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see 18* U.S.C.

3

§2711(3)(A)(i).

## **Probable Cause**

13.     The DEA and Bureau of Alcohol, Tobacco, and Firearms (ATF) have been investigating OGMAN's distribution of methamphetamine, fentanyl and other controlled substances in and around New Haven.

14.     In the month of March 2024, an ATF Confidential Source, referred to herein as the CS, has become a trusted customer of Donald OGMAN.  The CS is working under the direction of the ATF and DEA solely for monetary purposes and is a known, reliable CS who has provided specific, corroborated information in the past which has led to arrests and facilitated the gathering of evidence during felony investigations.

15.     OGMAN has been identified as one of the leaders of the Grape Street Crips gang, a Drug Trafficking Organization operating in the greater New Haven area of Connecticut. OGMAN is a convicted felon with multiple drug related convictions including a federal conviction for Conspiracy to Possess with Intent to Distribute Narcotics.  He is currently on federal supervised release.  *See United States v. Ogman*, 12CR74(SRU).

## **CONTROLLED PURCHASE #1**

16.     During the week ending on March 16, 2024, members of the NHDO in conjunction with the ATF formulated plans to utilize the CS to purchase narcotics from OGMAN.

17.     At approximately 12:46 P.M. ~~A.M.~~, OGMAN texted the CS from **Target Telephone 1** "Yoooo I'm not over there West Haven." The CS responded, "Ok running I motherfuckers made me clean the truck and fuel three truck. I'll be there about two 230 to shoot me the address I'll be there I got you I promise you know my word my bond." OGMAN responded, "Ok I got a dentist appointment

at 3pm so but that's going to be fast." The CS responded, "Ok got you i'll be there way before three so you'll have time to get you a dentist appointment. I promise to shoot me the address where I gotta be." OGMAN responded, "Ok as soon you get closer hit me I mite be anywhere."

18.     At approximately 1:30 P.M., law enforcement met with the CS at a primary meet location. At approximately 1:40 P.M., SA Lugo provided the CS with $1,000.00 of DEA OAF, as witnessed by SA MacNamara.

19.     At approximately 1:49 P.M., OGMAN texted the CS from (678) 306-9517, "You close?"  At approximately 1:58 P.M., ATF SA Sam Fuller searched the ATF CS, no contraband or weapons were located. At approximately 1:59 P.M., ATF TFO Matthew Borges and ATF SA Fuller searched the CS vehicle, no contraband or weapons were located.

20.     At approximately 2:02 P.M., ATF SA Rettig activated electronic and audio surveillance.

21.     At approximately 2:05 P.M., the CS departed the primary meet location and headed to the secondary meet location to place a phone call to OGMAN. During the drive from the primary meet location to secondary meet location the CS was under constant surveillance by ATF SA Rettig and ATF SA Fuller.

22.     At approximately 2:14 P.M., the CS called OGMAN's other known phone (475) 318-2671 ("**Target Telephone 2**") as witnessed by SA MacNamara. OGMAN answered the phone, and a female voice could be heard in the background. OGMAN says "Yo" the CS says "Yo", OGMAN immediately responds with "Facetime." The CS states, "My fault my fault I'm trying to this shit's not letting me answer it". OGMAN responded, " Wait Wait Wait Imma call you." OGMAN proceeded to facetime the CS multiple times, the CS did not answer the Facetime calls and attempted to call

OGMAN back via phone. However, OGMAN immediately sent the phone calls to voicemail. While the CS and OGMAN were attempting to speak with each other they exchanged several text messages. OGMAN texted "Turn off your Bluetooth," and the CS responded, "Did it's not working as soon as I call it hangs up." OGMAN texted, "Ok just answer my phone," the CS responded, "Yes boost." OGMAN texted "Picc up the phone" the CS responded, "Let me move No bars." OGMAN texted "Idk," the CS texted back, "Hold on moving from under Q bridge." OGMAN responded, "Cuz no more text."

23.    At approximately 2:22 P.M., the CS began driving towards the area of Dixwell Avenue, where the prior transactions had been conducted, while under surveillance by SA Rettig and ATF SA Fuller.

24.    At approximately 2:25 P.M., the CS placed a Facetime call to **Target Telephone 2** on which OGMAN directed him to the Burger King in Hamden (937 Dixwell Avenue, Hamden, CT).

25.    At approximately 2:38 P.M., GS Raymond McGrath observed the CS enter the Burger King parking lot. At approximately 2:39 P.M., IRS SA Dustin Johnson observed a black male wearing camouflage pants and a black jacket walk up to the CS vehicle and enter the front passenger's door. At approximately 2:41 P.M., IRS SA Dustin Johnson observed OGMAN walk between two brick buildings north of Burger King.

26.    At approximately 2:54 P.M., law enforcement met with the CS back at the primary meet location. The CS relinquished three knotted clear plastic bags containing numerous multicolored pills which field tested positive for Methamphetamine and Fentanyl (Exhibit 15) to SA MacNamara, as witnessed by SA Lugo. Following this transfer, ATF SA Fuller searched the CS and ATF SA Patruno searched the CS Vehicle for contraband and excess currency. These searches netted negative

results.

27.     Subsequent to the controlled purchase, law enforcement conducted a debrief of the CS. The CS stated that upon arrival at the Burger King parking lot, OGMAN approached the CS vehicle, entered the front passenger side and came to rest in the passenger seat.  The two parties discussed the phone issues the CS was experiencing which led to the traditional cellular call to OGMAN's phone.  The CS eased the frustrations of OGMAN and the parties began discussing the transaction. During the transaction within the vehicle, OGMAN removed the quantity of pills from his front left cargo pants pocket.  The pills were contained within three small plastic twist baggies. The CS provided OGMAN the United States currency in exchange for the pills.  It is be noted OGMAN did not count the money provided by the CS. Additionally, OGMAN informed the CS he believed he provided the CS with more than the agreed upon 280 pills.  It is to be noted the total pill count was tallied at two hundred and fifty-three (253), as enumerated by SAs Lugo and MacNamara while at the NHDO following the controlled purchase and surveillance operation.

## CONTROLLED PURCHASE #2

28.     During the time period of March 17 – March 24, 2024, the ATF CS had contact with OGMAN in relation to arranging a future controlled narcotics purchase. The CS was directed by members of ATF New Haven to arrange for a controlled purchase to take place on March 25, 2024. On March 24, 2024, OGMAN texted the CI [CS AM] from **Target Telephone 1,** "What time tomorrow you think big bro?"  The CI [CS AM] responded, "Around two."

29.     On March 25, 2024, at approximately 10:54 AM, OGMAN texted the CS from telephone number (475) 318-2671, "2pm?" and the CS responded with a thumbs up emoji.

30.     Later on that same date, at approximately 1:30 PM, law enforcement met with the CS

at the primary meet location. At approximately 1:37 PM, ATF SA Fuller searched the CS and ATF SA Rettig searched the ATF Special Purpose Vehicle (SPV) for any contraband and/or unaccounted for monies, which yielded negative results.  At approximately 1:45 PM, ATF SA Patruno provided the CS [CS AM] with $1,300.00 in ATF Agent Cashier Funds (ACF) for the purchase. At approximately 2:02 PM, ATF SA Rettig activated the ATF electronic surveillance to capture the transaction.

31.     At approximately 2:11 PM, the CS conducted a Facetime call to **Target Telephone 1**. During the conversation, OGMAN told the CS to meet on Stevens Street in New Haven Law enforcement surveillance units established positions in in the area of  Stevens Street.

32.     At approximately 2:25 PM, OGMAN completed a Facetime call to the CS [CS Am] from **Target Telephone 2** in which the CS told OGMAN that the CS was two minutes from Stevens Street.

33.     At approximately 2:29 PM, law enforcement observed the CS arrive at Stevens Street. The CS parked near the intersection of Stevens Street and Sylvan Avenue in New Haven.  A short time later, at approximately 2:31 PM, the CS attempted a Facetime call with OGMAN to **Target Telephone 1**.

34.     At approximately 2:35 PM, OGMAN texted the CS from telephone number **Target Telephone 2** which said, "2 minutes."  Several minutes later, starting at approximately 2:44 PM, the CS texted OGMAN "?"  OGMAN responded, "Around the corner" and the CS responded, "Bout to be out."  At approximately 2:50 PM, OGMAN then texted the CS, "I was at Walgreens with wife I ain't her to know my business." OGMAN then Facetimed the CS from **Target Telephone 2** and told the CS [CS AM] to come to Walgreens (88 York St, New Haven, CT 06511).

35.     At approximately 2:58 PM, the CS arrived at the Walgreens and parked next to a two-door dark colored Honda, associated with OGMAN.  ATF SA Patruno witnessed the CS park the

ATF SPV next to OGMAN's vehicle.  OGMAN entered the ATF SPV through the front passenger door and met with the CS. OGMAN reached into his front sweatshirt pocket and retrieved a bag containing pills which he placed into the center cupholder. In return, the CS provided OGMAN with $1,300 in ATF ACF. ATF SA Patruno observed OGMAN exit the ATF SPV and enter the dark colored Honda.

36.     At approximately 3:00 PM, the CS departed Walgreens parking lot and followed law enforcement back to the primary meet location.

37.     At approximately 3:04 PM, the CS arrived back at the primary meet location. At approximately 3:06 PM, ATF SA Rettig terminated the audio/video electronic surveillance and the ATF SPV was searched by TFO Neal.  At approximately 3:09 PM, the CS was searched by ATF SA Fuller for any additional contraband or unaccounted for monies, which yielded negative results.  The pills were taken into law enforcement custody by ATF SA Rettig.  Law enforcement counted the pills and found that the CS purchased 325 multicolored pills. DEA SA Brouillard subsequently conducted a field test of the pills, which resulted in the positive presumptive presence of Fentanyl.

38.     Based on the controlled purchases of narcotics from OGMAN, it is believed that OGMAN is utilizing **Target Telephone 1** and **Target Telephone 2** interchangeably to facilitate the sale of narcotics in the Greater New Haven area. However, to prevent redundancy and focus law enforcement resources, location data is only requested on **Target Telephone 1**.

39.     I am seeking historical location information from March 3, 2024 until the present and continuing for a period of thirty days. Based on the above, I have probable cause to believe and do believe that OGMAN communicates with his cellular device to sell narcotics.  I also have probable cause to believe and do believe that OGMAN carries his cellular device on his person. Obtaining

location information will enable law enforcement to determine where he is going, who he is meeting with and whether he has any stash locations. This will assist in ongoing investigative efforts by law enforcement to understand the full extent of the drug trafficking organization.

### Applicable Cellular Telephone Technology

40.    Based on my training and experience, I know that drug traffickers frequently have access to multiple cellular telephones or that they use other means of communication from their primary devices such as Facebook, Facetime, Snapchat, WhatsApp and other messaging applications, that they know it makes it more difficult for law enforcement to intercept those communications. I also know that narcotics traffickers and distributors frequently use cellular telephones subscribed to by other persons and prepaid cellular telephones that require the purchaser to provide little or no identifying information to purchase, activate, and utilize, all of which is done in an effort to avoid detection and thwart the efforts of law enforcement.

41.    I know that mobile phone providers have technical capabilities that allow them to collect and generate information about the locations of the mobile phones to which they provide service. Some of this information includes but is not limited to: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records, and (3) Call Detail Records (CDRs).

42.    In my training and experience, I have learned that VERIZON is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data, also known as GPS data or latitude-longitude data and cell-site data, also known as "tower/face

information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. [Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

43.     Based on my training and experience, I know that VERIZON can collect E-911 Phase II data about the location of the Target Cell Phone, including by initiating a signal to determine the location of the Target Cell Phone on VERIZON's network or with such other reference points as may be reasonably available.

44.     Based on my training and experience, I know that VERIZON can collect cell-site data about the Target Cell Phone. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as VERIZON typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

11

45.     Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the mobile telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise than E-911 Phase II data.

46.     Based on my training and experience, I know that VERIZON can collect cell-site data about **Target Telephone 1**. I also know that wireless providers such as VERIZON typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes. CDRs are a type of these records, and they contain data regarding telecommunication transactions without providing the content of that transaction. In part, the data contained in these CDRs includes cell site information utilized during the transaction.

47.     Based on my training and experience, I know that telephone companies, like VERIZON also collects data about the speed with which signals travel between cellular telephones and cellular towers ("per call measurement data," or "PCMD"). For each cellular telephone accessing its network, providers such as VERIZON use PCMD and other data to calculate and record the estimated location of that cellular telephone. T-Mobile refers to the resulting location information as Timing Advanced Information, and/or Timing Advance Report Date ("True Call").  Provider AT&T refers to this information as NELOS (Network Event Location System) and Provider VERIZON Wireless refers to this information as RTT (Round-Trip Timing).

48.     Based on my training and experience, I know that telephone companies collect Radio

Signal Strength Indicators (RSSI) data.  RSSI is a measurement of how well a device can hear, detect and receive signals from any wireless access point or Wi-Fi router.

49.     Based on my training and experience, I know that telephone companies also collect Media Access Control (MAC) addresses.  A MAC address is a unique identifier assigned to a network interface that allows communication on a physical network segment.

50.     Finally, I know that telephone companies collect Internet Protocol (IP) address, email address, email logs (without content such as the body of the email or subject lines), website address, servers, usernames, Wi-Fi hotspot locations, Wi-Fi ID history, and IP history location.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify location information.

**Historical and Prospective Location Warrants: Authorization Request**

51.     Based on the information set forth herein, I believe there is probable cause to believe that OGMAN is a drug distributor who works with other co-conspirators to commit the Target Offenses.  I also believe that probable cause exists to believe OGMAN uses **Target Telephone 1** in furtherance of his narcotics trafficking.  Obtaining precise location information for **Target Telephone 1** will assist investigators in identifying where OGMAN is meeting co-conspirators, where he may have other stash houses and where he may be going to resupply.  Accordingly, I request that the Court issue the proposed search warrant pursuant to 18 U.S.C. § 2703(c) and Fed. R. Crim. P. 41.

52.     I also request that the Court direct VERIZON to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachments B, C unobtrusively and with a minimum of interference with VERIZON's services, including by initiating a signal to determine the location of **Target Telephone**

**1** on VERIZON's network, and at such intervals and times as directed by the government. The government will compensate VERIZON for reasonable expenses incurred in furnishing such facilities or assistance.

53.     I further request that the Court direct VERIZON to disclose to the Government any information described in Section 1 of Attachment B that is within its possession, custody, or control. I further request that, pursuant to the preclusion of notice provisions of 18 U.S.C. §§ 2703(b)(1)(A) & 2705(b), the Court order VERIZON not to notify any person (including the subscriber or customer to whom the materials relates) of the existence of these applications, the warrants, or the execution of these warrants, for 60 days after the authorized period, unless the Court extends such period under 18 U.S.C. § 2705(b). VERIZON may disclose this Order to an attorney for VERIZON for the purpose of receiving legal advice. Non-disclosure is appropriate in this case because the Court's Order relates to an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation, and its disclosure may alert the targets to the existence of the investigation. There is accordingly reason to believe that notification of the existence of the Order will seriously jeopardize the investigation including by giving targets an opportunity to destroy evidence, change patterns of behavior, intimidate potential witnesses, or flee from prosecution. See 18 U.S.C. § 2705(b).

54.     I further request that the Court authorize execution of the precision location warrant (Attachment C) at any time of day or night, owing to the potential need to locate **Target Telephone 1** outside of daytime hours. Because the historical cell-site warrant (Attachment B) will be served on VERIZON, who will then compile the requested records at a time convenient to VERIZON, reasonable cause exists to permit the extraction of those requested warrants at any time in the day or

14

night as well.

55.     I further request that the Court order that all papers in support of these applications, including the affidavit and search warrants, be sealed until further order of the Court, except that the government may provide the search warrant to VERIZON. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

Alex B. MacNamara
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me on April 8, 2024 in New Haven, CT.

HONORABLE MARIA E. GARCIA
UNITED STATES MAGISTRATE JUDGE

15

## ATTACHMENT A

Information about the location of the mobile phone assigned phone number (678) 306-9517, accessed through International Mobile Subscriber Identity ("IMSI") 311480790102424, with unknown subscriber information (hereinafter, "**Target Telephone 1**"), whose service provider is VERIZON a company that accepts process at 180 Washington Valley Rd., Bedminster, NJ.

**ATTACHMENT B**

**Information to be Disclosed by VERIZON**

To the extent that the information described in Attachment A is within the possession, custody, or control of VERIZON, including any information that has been deleted but is still available to VERIZON or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), VERIZON is required to disclose to the government the following information pertaining to **Target Telephone 1** listed in Attachment A **for the last 30 days:**

1.    The following information about the customers or subscribers of **Target Telephone 1:**

    a.  Names (including subscriber names, user names, and screen names);

    b.  Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

    c.  Local and long distance telephone connection records;

    d.  Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

    e.  Length of service (including start date) and types of service utilized;

    f.  Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

    g.  Other subscriber numbers or identities (All Internet Protocol (IP) address, email address,

email logs (without content such as the body of the email or subject lines), website address, servers, usernames, WiFi hotspot locations, Wi-Fi ID history, and IP history location, including user identifying information and communications to and from **Target Telephone 1**; and,

h.  Means and source of payment for such service (including any credit card or bank account number) and billing records.

2.  All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by **Target Telephone 1**, including:

a.  The date and time of the communication, the method of the communication, and the source and destination of the communication;

b.  Call detail records to include numbers dialed, incoming numbers, call durations, signaling and communications processing information, geographic locations of towers and sectors activated, sent and received by **Target Telephone 1**, for any form of communication it is capable of including: voice, VoIP, VoLTE, text, SMS, MMS, internet, mobile-to- mobile, any push to talk feature, non-billed calls, uncharged call detail, airtime usage data, Automated Message Accounting records and data bases, calls-to-destination data and packet data, as available without communications content and excluding post-cut-through dialed digits);

c.  Information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent;

d.  Cell site data, including any data reflecting: the cell towers and sectors thereof utilized in routing any phone, text, or data communication to or from **Target Telephone 1**; the

approximate range of **Target Telephone 1** from the cell towers during the communication (including per-call measurement data "PCMD", round-trip time "RTT" data, Historical Mobile Locators "NELOS", Timing Advanced Information, and Timing Advance Report Date ("True Call").

### Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of 21 U.S.C. § 846 (conspiracy to commit narcotics trafficking offenses), 21 U.S.C. § 841(a)(1) (distribution of controlled substances) and 21 U.S.C. § 843 (use of communication facility in commission of crime) during the period of November 8, 2023, through the date of this Order (the "Target Offenses").

**This warrant does not authorize the collection of any content of any communications.**

## ATTACHMENT C

All information about the location of **Target Telephone 1** described in Attachment A for a period of thirty days, during all times of day and night, including:

1. Precise location information including:

   a. E-911 Phase II data;

   b. GPS data;

   c. Latitude-longitude data;

   d. Cell site data, including any data reflecting: the cell towers and sectors thereof utilized in routing any phone, text, or data communication to or from **Target Telephone 1**; the approximate range of **Target Telephone 1** from the cell towers during the communication (including per-call measurement data "PCMD", round-trip time "RTT" data, Historical Mobile Locators "NELOS", Timing Advanced Information, and Timing Advance Report Date "True Call");

2. Call Detail Records "CDR's" including:

   Cellular sites and associated street address to include numbers dialed, incoming numbers, call durations, signaling and communications processing information, geographic locations of towers and sectors activated, sent and received by **Target Telephone 1** for any form of communication it is capable of including: voice, VoIP, VoLTE, text, SMS, MMS, internet, mobile-to-mobile, any push to talk feature, non-billed calls, uncharged call detail, airtime usage data, Automated  Message Accounting records and data bases, calls-to-destination data and packet data, as available without communications content and excluding post-cut- through dialed digits;

3. Radio Signal Strength Indicators (RSSI) for the period of this Warrant, timing advance and

other pertinent information delivered in real time with regard to neighboring towers as feasible;

4. The MAC address to include Wi-Fi MAC address and/or the access point(s) to which **Target Telephone 1** connects to the internet via wireless technology that allows computers and other devices to communicate over a wireless signal (commonly referred to as Wi-Fi), and packet data; and

5. All Internet Protocol (IP) address, email address, email logs (without content such as the body of the email or subject lines), website address, servers, usernames, Wi-Fi hotspot locations, Wi-Fi ID history, and IP history location, including user identifying information and communications to and from **Target Telephone 1**;

**This warrant does not authorize the collection of any content of any communications.**

VERIZON (hereinafter "the service provider") must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information about the location of **Target Telephone 1** unobtrusively and with a minimum of interference with service provider services, including by initiating a signal to determine the location of **Target Telephone 1** on the service provider's network, and at such intervals and times directed by the government.

The government shall compensate the service provider for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of Information about the location of **Target Telephone 1**. *See* 18 U.S.C. § 3103a(b)(2).

The service provider shall not disclose the existence of the search warrant to the listed

21

subscriber or to any other person for a period of one year from the date of this Order, or upon notice by the government within 30 days of the conclusion of its investigation, whichever is earlier, unless the Court extends such period under 18 U.S.C. § 2705(b).  *See* 18 U.S.C. § 2705(b).

The service provider may disclose this Order to an attorney for the service provider for the purpose of receiving legal advice.